CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2019 SEP -5 P 1: 07

FILED IN:

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY, CAMDEN,
NEW JERSEY

ROBERT C. DALTON, individual, |
|
|
Plaintiff, | CIVIL COMPLAINT
|
V. |
|
TANJU KARANFIL, an individual, JAMES P. CLEMENTS, |
an individual, CLEMSON UNIVERSITY, |
a South Carolina Corporation, and ET AL., |
|
Defendants |
|
|

**CIVIL SUIT FILING FOR DAMAGES FOR CONSPIRACY AGAINST CIVIL RIGHTS, LIBEL AND
SLANDER, PERSONAL INJURY, MALICIOUS INJURY TO PERSONAL PROPERTY, CONSPIRACY FOR
THE PURPOSE OF ACCOMPLISHING LAWFUL OBJECT BY UNLAWFUL MEANS, AND
CONSPIRACY FOR ACCOMPLISHING UNLAWFUL OBJECT. THE PLAINTIFF SEEKS ACTUAL
DAMAGES FOR $62 MILLION, NON-ECONOMIC DAMAGES FOR $25 MILLION AND PRAYS FOR
PUNITIVE DAMAGES. THE PLAINTIFF SEEKS TOTAL DAMAGES IN THE SUM OF $87 MILLION
PLUS THE PLAINTIFF PRAYS FOR $10 MILLION IN PUNITIVE DAMAGES**

**DELIVERY METHOD**: Personal Delivery by the Plaintiff

**FILED WITH:** Clerk of the Court
U.S. District Court;
District of New Jersey
H. Cohen Building
& U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101
856-757-5021

|     | **FILED BY:** | Robert Carl Dalton |
|-----|---------------|--------------------|

**FILED BY:**    Robert Carl Dalton
24 Maryland Rd
45                Little Egg Harbor Twp., NJ 08087
Phone: 609-879-9699
E-mail: rca.dalton@gmail.com

This Civil Complaint for the following crimes committed against the South Carolina Code of
50   Laws: **Sections 16-5-10; 16-6-20; 16-7-150; 16-11-510; and 16-17-410. And, with no deference
to Section 59-119-160 (4)(a)**

This Civil Complaint is filed against the two individuals and a South Carolina Corporate entity as
list herewithin in accordance to SC Code Section 59-119-60. Furthermore, there are other
55   individuals who may have that may have contributed to one or more of the crimes mentioned
above because of these other individuals had a relationship, in one form or another, with
Robert Carl Dalton and ESTEC Technology Works, LLC. Investigation into these other individuals
for their role in the crimes in this complaint and possible other crimes related to the complaint
needs to be carried out.

60
The actions of individuals and the corporate entity are described herewithin and this civil
complaint may be amended in the future and other supporting information may be
forthcoming. The following crimes are believed to have to be committed and deserve
prosecution, especially those individuals who State employment position requires strong ethics
65   and character.

## KNOWN ADDRESSES OF INDIVIDUALS AND ENTITIES WHOM THIS COMPLAINT IS FILED AGAINST:

70   A. Dr. Tanju Karanfil,
Vice President of Research,
Clemson University
230 Kappa Street; Clemson, South Carolina 29634
Phone: 864-656-7701; E-mail: tkaranfi@clemson.edu
75      Clemson University Compensation: appr. $278,091 (State Salary)

B. Dr. James P. Clements,
President
Clemson University
80   201 Sikes Hall
Clemson, South Carolina 29634
Phone: 864-656-3413
E-mail: president@clemson.edu
Clemson University Compensation: appr. $801,330 (State Salary of $312,530 and
85                      $488,800 by Clemson University Foundation)

C. Clemson University
   201 Sikes Hall
   Clemson, South Carolina 29631
90 Contact: Chairman E. Smyth McKissick III, Clemson University Board of Trustees

Note 1: Salaries were listed to show the level of responsibility each individual has, yet the
willfully intend to injury and harm Robert Carl Dalton and ESTEC Technology Works, LLC.

95 Note 2: Robert Carl Dalton is disabled for at moderate to severe traumatic brain injury (TBI) by
the State of New Jersey. Robert C. Dalton is Managing Partner of ESTEC Technology Works, LLC,
and Robert Carl Dalton currently owns 100% of the Stock of ESTEC Technology Works, LLC.
Robert Carl Dalton is the sole representative, sole member and only representative ESTEC
Technology Works, LLC.

100
Under the Federal Law, the Americans with Disabilities Act (ADA), Robert Carl Dalton requests
"reasonable accommodations" under the Americans with Disabilities Act. The requested
"reasonable accommodations" include more time to file, to act and to response to Court
practices. Typically, Robert Carl Dalton needs twice the allotted time or more to file , to act,
105 and to respond. Furthermore, Robert Carl Dalton communicates with circumstantial and
tangential means in his writing and speaking which can also be accompanied with non-
threatening emotional dysregulation, dyslexia, ADD, and dysgraphia. Often, Robert Carl Dalton
can experience cognitive overload which can have negative effects on his executive functions
and cause extreme fatigue, mentally and physically. Moreover, Robert Carl Dalton has a severe
110 photophobia which is wavelength specific (color of light).

Furthermore, Robert Carl Dalton has had two subsequent concussive events since being
disabled for a TBI; These two concussive events occurred in December 2017 and March 2019.
Robert Carl Dalton is currently being treated for injuries sustained in these events and for
115 original TBI injuries exacerbated by these events. Therefore, SC Code Section 15-3-40, 15-3-50,
and 15-3-60 may apply to Robert C. Dalton.

### THE CIVIL COMPLAINT SPECIFICS:

#### 1. South Carolina Code 16-5-10 Conspiracy Against Civil Rights:

120 "It is unlawful for two or more persons to band or conspire together or go in disguise upon the
public highway or upon the premises of another with the intent to injure, oppress, or violate the
person or property of a citizen because of his political opinion or his expression or exercise of the
same or attempt by any means, measures, or acts to hinder, prevent, or obstruct a citizen in the free
exercise and enjoyment of any right or privilege secured to him by the Constitution and laws of the
125 United States or by the Constitution and laws of this State.

**The following individuals and entity broke SC Code 16-5-10 as briefly described as follows.**
Dr. Tanju Karanfil, Dr. James P. Clements, Clemson University (CU) [a.k.a. herein collectively

referred to as "THE TRANSGRESSORS], and possibly others as listed and discussed hereinafter
130    [a.k.a. herein collectively referred to as "THE OTHERS"] and possibly active participants [a.k.a.
       herein collectively as "ACTIVE PARTICIPANTS" banded and conspired together with the intent to
       injury, to oppress, to harm and to prevent Robert Carl Dalton and his property, ESTEC
       Technology Works, LLC, (ETW) [a.k.a. herein collectively referred to as "DALTON/ETW"] from
       exercising and enjoying DALTON/ETW's civil rights secured to "DALTON/ETW" as their rights
135    under Title 46, Chapter 55 "Industrial Hemp Cultivation"; Section 46-55-20 "Industrial Hemp
       Program; research; permits; regulations"; Part(2).

       *Part (2) reads as follows:*

       *"Industrial hemp is an agricultural crop. Any public institution of higher education*
       *offering a four-year baccalaureate degree or private institution of higher education*
140    *accredited by the Southern Association of Colleges and Schools offering a four-year*
       *baccalaureate degree throughout the State may conduct research, pursuant to Public*
       *Law 113-79, <u>contingent upon funding. The institution may conduct research or pilot</u>*
       *<u>programs as an agricultural commodity and may work with growers located in South</u>*
       *<u>Carolina. Once the institution of higher education engages in research on industrial</u>*
145    *<u>hemp, the institution shall work in conjunction with the Department of Agriculture to</u>*
       *<u>identify solutions for applications, applicants, and new market opportunities for</u>*
       *<u>industrial hemp growers. The purchaser or manufacturer will be included under the</u>*
       *<u>provisions of this chapter."</u>*

150    The TRANGRESSORS, who are members of an institution of higher education [Clemson
       University] and an institution of higher education [Clemson University] had engaged in research
       on industrial hemp; however, while this law states that the institution **SHALL** work "to identify
       solutions for applications, applicants and new market opportunities for industrial hemp
       growers" and "the purchaser or manufacture will be included under the provisions of this
155    chapter", the TRANGRESSORS refused to work with DALTON/ETW (a.k.a. Planet Energy) in the
       Clemson University Industrial Hemp Pilot Program under the South Carolina Industrial Hemp
       Program in conjunction with the South Carolina Department of Agriculture (SCDA). Thus,
       DALTON/ETW were prevented from free exercise and enjoyment of their civil rights granted to
       them under SC Title 46; Chapter 55; Section 20; Part (2) by the TRANSGRESSORS. Furthermore,
160    "identify solutions" or identifying solutions are found by means of a research program; research
       programs are required by States which have hemp programs under Federal Law (2014 Farm
       Act). The SCDA hemp program required applicants for hemp permits for growing hemp to
       "identify solutions" with Clemson University [a public institute of higher learning] being that
       Clemson University was engaged in industrial hemp research. DALTON/ETW were a hemp
165    permit applicant who were vertically integrated to grow hemp, manufacture hemp products,
       sell hemp products and purchase hemp products from other growers. Such a vertical
       integrated operations can have sales revenues in the tens of millions of dollars.

Moreover, The TRANSGRESSORS willfully, maliciously, and intentionally denied DALTON/ETW
170 access to the government services of South Carolina in the SC Industrial Hemp Program.

Moreover, DALTON/ETW had an agreement with Clemson University to engage in agriculture
economic research, and DALTON/ETW agreed to pay the asking amount for this research by
Clemson University. This agreement was made with the agricultural side of Clemson University
175 by the late Dr. Jeanne Briggs [Exhibit 1] for DALTON/ETW to work with Nathan Smith for an
enterprise budget/production cost assessment which was believed to be under the Direction of
Dr. Christopher Ray.

Dr. Christopher Ray was one of two people who were key decisions makers in the Clemson
180 Industrial Hemp Pilot Program [CU IHPP] according to Clemson's website page about the CU
IHPP at this time in 2017. Dr. Ray was listed at the decision maker for the agricultural side of the
CU IHPP, and Dr. Karanfil was listed as the decision maker for the engineering side of the CU
IHPP.

185 Moreover, in August 2017, DALTON/ETW initiated the "CALL FOR LETTERS OF INTENT FOR THE
SC INDUSTRIAL HEMP PILOT PROGRAM RESEARCH" to science, medical, and engineering
researchers at qualifying institutes of higher learning. Over a hundred emails were sent out
across South Carolina.

190 During the entire process from beginning to when the crimes were committed, DALTON/ETW
followed all pertinent Federal and State Laws. Moreover, DALTON/ETW had no interest in
developing intellectual property with any university.

Several responses from researchers at and associated with Clemson University were received
195 by DALTON/ETW; these researchers were from the engineering and science side of Clemson
University and a medical program associated with Clemson University. As already noted,
DALTON/ETW had reached an agreement for agricultural economic research with the
agricultural side of Clemson University through Dr. Briggs who worked for Dr. Ray.

200 Moreover, initially DALTON/ETW had more two engineering researchers associated with CU
who wanted to work with DALTON/ETW on their research ideas. These researchers were
associated with Dr. Karanfil's section of the SC IHPP. So, on September 4, 2019, DALTON/ETW
contacted the TRANSGRESSORS to meet to discuss working with these two other researchers in
the engineering and science section of Dr. Karanfil's oversight. Specifically, Pres. Clements, Dr.
205 Karanfil and Clemson University were sent these first couple emails with ETW d.b.a. as Planet
Energy© in September 2017 [EXHIBIT 2]

On September 05, 2017, the TRANSGRESSOR emailed DALTON/ETW [EXHIBIT 2] informing
DALTON/ETW that the TRANSGRESSORS would not work with DALTON/ETW in Clemson

210 University's Industrial Hemp Pilot Program [SC IHPP]. DALTON/ETW replied asking if
DALTON/ETW was still allowed to work with the original agreement with Dr. Briggs under Dr.
Ray on September 05, 2019; later that day the TRANSGRESSORS replied to DALTON/ETW stating
that DALTON/ETW could not work with Dr. Briggs, Dr. Nathan Smith and Dr. Ray. The
TRANSGRESSORS specifically contacted Dr. Ray to let Dr. Ray know that he could not work with
215 DALTON/ETW.

DALTON/ETW emailed Dr. Karanfil asking Dr. Karanfil what the reason for not working with
DALTON/ETW; Dr. Karanfil did not reply.

220 Next, DALTON/ETW contacted, via phone, several members of the Board of Trustees of CU. A
few members were left messages multiple times by DALTON/ETW. A couple members spoke
with DALTON/ETW; these members were Mr. Swann, Mr. Wilkins and Louis P. Batson, Jr.

Mr. Swann advised DALTON/ETW to speak with Dr. Karanfil to ask him what his reason for this
225 denial was; DALTON/ETW emailed Dr. Karanfil asking him for the reason, but there was no
response from Dr. Karanfil.

Mr. Wilkins spoke to DALTON/ETW, and then they exchanged emails [EXHIBIT 3]; Mr. Wilkins
never provided DALTON/ETW with any return information to his inquiry.

230
Mr. Batson told DALTON/ETW that the TRANGRESSORS would not work with DALTON/ETW
because DALTON/ETW would not provide a large amount of money to Clemson University from
the DALTON/ETW research plan.

235 Ms. McAbee and Mr. Smith were left multiple messages, but they did not return
DALTON/ETW's calls.

Next, I contacted the head of SCDA, but he was not in. He and the person in charge of the SC
Industrial Hemp Program were out of town. The gentleman at SCDA to whom DALTON/ETW
240 spoke said that he would make an inquiry with Clemson about this situation.

This SCDA person at the SCDA with called Dr. Ray, and then spoke to Dr. Ray about the situation
between the TRANSGRESSORS AND DALTON/ETW.

245 Next, this person at the SCDA called DALTON/ETW to tell DALTON/ETW about what Dr. Ray told
this gentleman at the SCDA about the situation between the TRANSGRESSORS and
DALTON/ETW. This gentleman at the SCDA told DALTON/ETW that Dr. Ray said the decision
not to work with DALTON/ETW came from "higher-up". Higher-up could only mean the
Provost, President Clements, an Executive Vice President and a member or members of the

250    Board of Trustees, because at this time Dr. Karanfil and Dr. Ray were Vice Presidents. THIS
       NEEDS TO BE INVESTIGATED.

*****

255
       But before going on, here is some background on Planet Energy© with CU Pres. Clements and
       Clemson University:

       On November 5, 2016, Planet Energy© was first introduced to Pres. Clements, other CU
260    officials, and Clemson University at an alumni event in the Chinese Embassy with the
       Chinese Ambassador to the U.S.A. in Washington, DC on the day after President Trump
       was elected. ETW's Planet Energy brochures had a description of Planet Energy and an
       investment pitch for $10 Million [EXHIBIT 4]. Copies of Planet Energy's description and
       investment pitch was handed by me to Pres. Clemson who then ask me to give the
265    brochures to the person whom Pres. Clements directed me to give the brochures. These
       brochures included the Planet Energy's White Tigers© theme (The White Tiger is a
       legendary Chinese creature).

       In May 2017, my records show that I contacted Pres. Clements to find the contact CU
270    person working with Duke Energy on a proposed new gas turbine cogeneration facility
       on campus; President Clements replied to DALTON/ETW. President Clements contacted
       CU EVP Brett Dalton to contact DALTON/ETW.

       DALTON/ETW received a call from Brett Dalton who, upon Pres. Clements direction,
275    wanted me to give written comments about the proposed Duke Energy cogeneration
       facility for CU. DALTON/ETW spoke to Brett, and then DALTON/ETW reviewed the Duke
       Energy's energy supply contract with Clemson University which DALTON/ETW found on
       the SC Board Public Service Commission's website. DALTON/ETW's examination of the
       contract found, in DALTON/ETW's opinion, some very peculiar terms of this proposed
280    contract.

       In DALTON/ETW's opinion Clemson University was accepting a very bad pricing structure
       for heat, higher costs, and a very strange pricing system. In DALTON/ETW's professional
       opinion with 30 years of electrical utility and energy experience, the pricing system was
285    overcharging CU for natural gas prices; prices were based upon Henry Hub natural gas
       prices, not Appalachian natural gas prices which is the most likely source of the natural
       gas in Duke Energy's pipelines. DALTON/ETW's had serious concerns about some
       aspects of the proposed facility after DALTON/ETW'S review.

290    The Appalachian natural gas prices were typically 30% lower than Henry Hub prices.
       Moreover, DALTON/ETW believe that CU was accepting natural gas prices above market
       value, and CU was subsidizing Duke Energy's non-fixed energy prices during peak-rate
       hours. Furthermore, Duke was using turbine technology that was less in efficiency and
       higher priced than GE Jenbacher reciprocating engines.

295

       The questions from DALTON/ETW was: "WHY IS CLEMSON PAYING DUKE HIGHER PRICES
       FOR HEAT WHILE SUBSIDIZING DUKE ENERGY'S PROFITS?" and "WHY ARE TURBINES
       BEING USED OVER GE JENBACKER ENGINES?" Something seems strange about this to
       DALTON/ETW.

300

       DALTON/ETW was deeply concerned about what to do about what he found in the
       energy supply contract, but around the same time DALTON/ETW had to prioritize
       DALTON/ETW's time. DALTON/ETW began to prepare their application to grow hemp
       for the SC Industrial Hemp Program and to further inquire about Planet Energy's
305    potential location at the sought-after property in Central, SC.

       DALTON/ETW did not report of their findings to Brett Dalton, the financial manager of
       Clemson University because of the explained events that are described hereinafter
       pertaining to the SC Industrial Hemp Program; DALTON/ETW were concerned that there
310    might be corruption at CU regarding the energy matters but soon DALTON/ETW
       experienced the TRANSGRESSORS' willful, malicious and intentional crimes against
       DALTON/ETW's civil rights and willful, malicious  and experience intentional other
       injuries and harm to DALTON/ETW.

315    In 2017, sometime after 2016 when DALTON/ETW found, and then sought-after a
       location in Central that seemed ideal to locate Planet Energy. This property in Central
       was an estate which was owned by the former wives of a late prominent IPTAY
       supporter and good friend of INDIVIDUAL 1. At sometimes later, the realtor told
       DALTON/ETW that INDIVIDUAL 1 harvests hay or some other grain for the owner. At
320    some point later, DALTON/ETW told the realtor that DALTON/ETW intend to grow hemp
       at this location.

       In late August 2019, DALTON/ETW was given verbal permission to lease the farm to
       grow hemp and awaited to meet the owners to fill-out the proper lease forms required
325    by SCDA's hemp permit application. The understanding between the owners and
       DALTON/ETW was that If DALTON/ETW received a permit to grow hemp then
       DALTON/ETW planned on raising money to purchase the estate for Planet Energy, as the
       property was currently for sale. Soon afterwards, a strange event happened.

Case 3:19-cv-17645-MAS-TJB   Document 1   Filed 09/05/19   Page 9 of 21 PageID: 9

330     Strangely, about one week the original due date for submission of the hemp permit
        applications, the 1st wife who was close to INDIVIDUAL 1 called the realtor. She told the
        realtor to tell DALTON/ETW that she changed her mind about leasing the property to
        DALTON/ETW for growing hemp.

335     A few days later, DALTON/ETW went to see INDIVIDUAL 2 at his office to inquire if
        INDIVIDUAL 2 has any land to lease to DALTON/ETW. To the surprise of DALTON/ETW,
        INDIVIDUAL 2, who successfully led the lobbied for the SC Industrial Hemp Program, told
        DALTON/ETW that INDIVIDUAL 2 and INDIVIDUAL 1 was submitting separate
        applications to grow hemp with the SCDA. (As it turned out, INDIVIDUAL 1 and
340     INDIVIDUAL 2 did receive permits to grow hemp from the SCDA Industry Hemp Program
        months later.)

        Soon after losing the farmland in Central, DALTON/ETW found farmland in Laurens
        County. This farmland was through a college roommate from Dalton's undergraduate
345     days at Clemson University. Regardless, without Clemson University working with Planet
        Energy, DALTON/ETW could not submit a complete and proper hemp growing
        application to the SCDA. Therefore, DALTON/ETW had no possibility to obtain a permit
        to grow hemp by the SCDA.

350     This is not the first time that DALTON experienced wrongdoing and strange events at
        Clemson University. BUT, Dr. Karanfil is indirectly related to these first-time
        wrongdoings that DALTON experienced at CU.

        In the 1990's, DALTON was employed at the Environmental Systems Engineering (ESE)
355     Department for a period of time. (*During this same time, Dr. Karanfil was employed at
        the University of Michigan. Subsequently after Dalton was terminated at the ESE for
        exposing a wrongdoing to the US Department of Energy, Dr. Karanfil was employed by
        CU at ESE in 1996, and then from 2008-2013 was Dr. Karanfil was the department chair
        of ESE. In 2014, Dr. Karanfil became the V.P of Research at CU*)

360
        From 1994 to sometime in 1995, DALTON worked at Vitlab of CU's Department of
        Environmental Systems Engineering which was at the Linvil Rich Building. The Linvil Rich
        building is located at the CU Research Park in Anderson, SC; the Vitlab was in a building
        behind the Linvil Rich building.

365
        Dalton found many strange arrangements and operations on the Federal contract that
        provided the funds for DALTON to work at ESE's VitLab. DALTON was responsible for all
        the glass processing and materials work at the Vitlab where the principal investigator
        had a secret agreement with their US Department of Energy contractor not to employ
370     any ceramic engineers at the Vitlab (Robert C. Dalton is a ceramic engineer).

Case 3:19-cv-17645-MAS-TJB  Document 1  Filed 09/05/19  Page 10 of 21 PageID: 10

375

A  particular professor person who was in charge of the Vitlab and who was DALTON's
work supervisor was responsible for these strange events and activity; this particular
person is now a professor emeritus, and **he had an office next to Dr. Karanfil in 2017**.
(*Environmental Systems Engineering* is currently known as *Environmental Engineering
and Earth Science*.) This particular professor person did not like Dalton.

380

In August 2017, this particular professor person was sent a "CALL FOR LETTERS OF
INTENT FOR THE SC INDUSTRIAL HEMP PILOT PROGRAM RESEARCH" by DALTON/ETW
[EXHIBIT 5].

Possibly, this particular professor person played a major role in these crimes in this
complaint. This person's operation in 2017 was filled with nepotism, favoritism and, in
my opinion, unethical professional behavior.

385

In the 1990's, Dalton reported this unethical behavior to a major project Federal
Sponsor, the US Department of Energy; DALTON's actions were found to be correct, but
DALTON's employment contract was terminated days later by this particular professor
person who was the principle investigator on the contract  and who conspired with the
managing director at the VitLab of Clemson University at the Research Park in Anderson,
SC. to terminate DALTON.  The particular professor person could be a significant suspect
in these crimes of this complaint

390

As describe above, three strange events a happen in the Summer of 2017:

395

1) DALTON/ETW's initial farmland site to grow hemp was taken away from
DALTON/ETW, and by coincidence INDIVIDUAL 1 who applied and who was
granted one of 20 original permits to grow hemp under SC Industrial Hemp
Program  worked for and was close friend of the owner of the farmland site;
2) the TRANSGRESSORS refused to work with DALTON/ETW in the SC Industrial

400

Hemp Program as mandated by SC Law; and
3) In DALTON/ETW's opinion, DALTON/ETW found that CU and Duke Energy may
have a strange pricing agreement that would be financially bad for CU
(DALTON/ETW could be incorrect).

405

*****

Now, the complaint' main discussion of the TRANSGRESSORS actions against DALTON/ETW
regarding DALTON/ETW's permit application to grow, to manufacture, to sell and to buy hemp
under the SC Industrial Hemp Program continues.

410

EXHIBIT 2 contains a collection of emails exchanges between the TRANSGRESSORS and DALTON/ETW. These emails in EXHIBIT 2 discuss DALTON/ETW's participation in the SC Hemp program with the TRANSGESSORS as the research institution which is required by the SC Law. At the time of this exchange, DALTON/ETW already had an agreement with the agricultural side
415  of the CU IHPP.

The email exchange [Exhibit2] provides solid evidence that the TRANSGRESSORS would not work with DALTON/ETW as required by the SC Industrial Hemp Cultivation Law. This email exchange by the TRANSGRESSORS and DALTON/ETW is solid evidence that the TRANGRESSORS
420  committed the crimes as listed above in this complaint.

On September 04, 2017 [EXHIBIT 2], DALTON/ETW contacted President Clements, Dr. Karanfil and Clemson University about a meeting on September 6, 2017 to discuss the research with the engineering and science side of the CU IHPP. DALTON/ETW sent an attachment with Planet
425  Energy's proposed hemp assay which would be a small part of the other 18 hemp acres which would be used to grow the highest value hemp product, CBD's, under a CU research program for an economic study by Dr. Nathan Smith which was under the oversight of Dr. Christopher Ray on the agricultural side of CU and managed by Dr. Jeanne Briggs [EXHIBIT 1].

430  CBD tincture products were selling for the equivalent of between $80,000 and $139,000 per kg CBD, and DALTON/ETW intended use the enormous profits from DALTON/ETW internet retail sales and wholesale of CBD products to fund the research, development and commercialization of other energy programs at Planet Energy© and to promote the Appalachian Energy Project© [APPENDIX A].

435

Moreover, an ADDITIONAL SEVEN (7) Clemson University RESEARCHERS at CU reached out to DALTON/ETW to work with DALTON/ETW'S Planet Energy at a later day, and this date was before the final deadline for submitting a permit application to the SCDA. BUT, these seven researchers were not allowed to work with DALTON/ETW according to the TRANSGRESSORS.

440

The seven researchers were very accomplished professionals. One of these seven CU researchers was a Senior Researcher and Engineer at the United States Department of Agriculture (USDA) and adjunct professor at CU. The remaining six individuals are an entrepreneur in bioenergy and bio-coproducts, a CU professor in Biosystems Engineering, a CU
445  Assistant Professor in Biosystems Engineering, a CU Assistant Professor in Environmental Systems and Engineering, a CU Coordinator of Integrated Pest Management and Sustainable Agriculture Programs, and an Associate Professor in Biosystems Engineering [EXHIBIT 6].

In September 2017, the DALTON/ETW  permit application was sent to SCDA without the needed
450  agreements with CU; This lack of research agreement with CU prevented DALTON/ETW from obtaining a permit to grow hemp in South Carolina's Industrial Hemp Program.  DALTON/ETW

withheld information on the 20-acre of farmland in Laurens County to be farm with hemp, DALTON/ETW's full confidential research plan and full confidential business plan, and did not use the two available South Carolina residents who would have signed the application; without
455 the involvement with one to ten of the Clemson University's researchers and without a Clemson University research agreement with the CU IHPP, DALTON/ ETW could not submit a proper permit for DALTON/ETW's vertical operation to grow hemp, to extract and manufacture CBD products, to market wholesale and internet retail sales of CBD, and to research hemp species and products. Therefore DALTON/ETW had no ability to receive a permit to grow hemp
460 by the SCDA, and the TRANSGRESSORS caused DALTON willful, intentional and malicious injury and harm to DALTON/ETW. Hence, DALTON/ETW lost their ability to establish Planet Energy in South Carolina, lost their funding source to develop the Appalachian Energy Project, and lost substantial revenues from the sales of CBD products from 18 acres of hemp containing high levels (10-12%) of CBD, terpenes and other cannabinoids. The profits to DALTON/ETW'S retail
465 value of these CBD product sales are between $43 million and $63 million.

Therefore, DALTON/ETW withheld any proprietary, confidential, and privileged information from being disclosed in their hemp permit application to SCDA; The malicious and corrupt actions by the TRANSGRESSORS caused DALTON/ETW to withhold such.

470
Robert C. Dalton and ESTEC Technology Works, LLC were harmed and injured by the actions of the Transgressors and, possibly by the Others. The actions of the TRANSGRESSORS were with intent being false with respect to the requirements of the SC Hemp Law and were malicious and intentional actions towards Robert Carl Dalton and ESTEC Technology Works, LLC.

475
The wrongful and willful actions by the Transgressors intended to injure Robert C. Dalton and ESTEC Technology Works, LLC to cause harm to Robert Carl Dalton and ESTEC Technology Works. DALTON/ETW were harmed and injured by these actions

480 The willful and wrongful conduct by the TRANSGRESSORS were motivated primarily by unreasonable financial gain because Mr. Baston, a CU Board of Trustees member, told DALTON/ETW that the TRANGRESSORS would not work with DALTON/ETW because DALTON/ETW would not and could not provide much money to Clemson University from DALTON/ETW's research plan. The DALTON/ETW research plan provided very little monies to
485 the CU IHPP because the Clemson University clearly stated that "At present, there are no Clemson PSA researchers with experience in the production of hemp" and, likewise, those Clemson researchers who worked outside of the PSA in the science and engineering departments of CU did not have experience either. It was the intent of DALTON/ESTC during the proposed first year of the working with the CU researchers that the time spent the first year
490 was a learning time for future work in the relationship with the CU IHPP. There were other possible conflicts:

Planet Energy of DALTON/ETW was in direct competition with CU and CU research parks
for research and commercialization funding of innovations. Many of Planet Energy's
495    areas of research for hemp were in direct competition for energy, biofuel, and materials
work that were being researched at CU research parks which include ICAR in Greenville,
Clemson's Innovation Campus and Technology Park in Anderson, and the Restoration
Center in Charleston, SC. The Competition by Planet Energy also affected other Clemson
Research Centers which are directly associated with energy: SCE&G Innovation Center,
500    the Duke Energy Innovation Center and the Duke Energy's eGRID as well as many other
of CU's corporate research partners in these areas. Duke Energy Innovation Center is a
joint venture between Clemson University and the South Carolina Research Authority
(SCRA). Oddly, the TRANSGRESSORS never mention to thes places to DALTON/ETW or
asked DALTON/ETW (Planet Energy) to participate at these CU research centers and
505    parks. See SC State mandate of SC Code Section 59-119-160 (4)(a).

The TRANSGRESSORS understood that their unreasonably dangerous nature of their harmful
conduct, together with the high likelihood that DALTON/ETW would be harmed and injured as a
result from the TRANGRESSORS' conduct, and the TRANGRESSORS' actions toward
510    DALTON/ETW were known and approved by the CU President, CU Officers, and other CUs
person responsible for making policy decisions on behalf of the TRANGRESSORS.

Furthermore, the TRANSGRESSORS' actions could subject the TRANSGRESSORS to convictions of
felonies, and the TRANGRESSORS' acts and course of conduct are proximate causes of the
515    damage, injury, harm and insult to DALTON/ETW.

Other related actions by the TRANSGRESSORS were insulting to DALTON/ETW. Subsequent to
the 2017 permit application extended deadline by the SCDA, CU's Webpage for the CU IHPP
incorporated a very large amount of ETW's areas or proposed research in ETW's "CALL FOR
520    LETTERS OF INTENT FOR THE SC INDUSTRIAL HEMP PILOT PROGRAM RESEARCH" solicitation.

Other actions by James T. Clements were very disturbing to DALTON/ETW. DALTON/ETW
disclosed to James T. Clement that DALTON was disabled for a traumatic brain injury (TBI). Mr.
Clements did not respond to Mr. Dalton's request for an explanation as to why the
525    TRANSGRESSORS would not work with DALTON/ETW. The American with Disabilities Act
requires that public entities, such as CU, have a Communication Standard for Disabilities. There
is a strong likelihood that the TRANSGESSORS do not have a written Communication Standard
for communication with someone with a moderate to severe TBI; A communication standard
for the TBI disability would include that a reasonable answer be given to the individual who has
530    a TBI. Moreover, Mr. Clements actions in this matter is concerning because Mr. Clements has a
child with an intellectual disability but Mr. Clements treats Mr. Dalton who has an intellectual
disability poorly and further violates Mr. Dalton's civil rights, if the TRANSGRESSORS do not
have a Communication Standard for some with a TBI.

535 **2. South Carolina Code 16-5-20 Punishment for Additional Crimes**

*"If in violating any of the provisions of Sections 16-5-10 or 16-5-50 any other crime, misdemeanor or felony shall be committed, the offender or offenders shall, on conviction thereof, be subjected to such punishment for the same as is attached to such crime, misdemeanor and felony by the existing laws of this State"*

540

The TRANSGRESSORS are believed to have committed other felonies: South Carolina Code 16-7-150 Slander and Libel, SECTION 16-11-510 Malicious Injury to Animals and Other Personal Property, and SECTION 16-17-410 Conspiracy.

545 **3. South Carolina Code 16-7-150 Slander and Libel**

*"Any person who shall with malicious intent originate, utter, circulate or publish any false statement or matter concerning another the effect of which shall tend to injure such person in his character or reputation shall be guilty of a misdemeanor and, upon conviction therefore, be subject to punishment by fine not to exceed five thousand dollars or by*
550 *imprisonment for a term not exceeding one year, or by both fine and imprisonment, in the discretion of the court; provided, that nothing herein shall be construed to abridge any right any person may have by way of an action for damages for libel or slander under the existing law."*

555 By Slander and Libel, the TRANSGRESSORS originated, uttered and circulated and published with malicious intent false statements about and false matters concerning DALTON/ETW. This crime was evident in the email trail in Exhibit 2 and other emails. The TRANSGRESSOR knowingly, willfully and intentionally injured DALTON/ETW. The injury included injury to the reputations, the characters, the ability to create Planet Energy, and to the ability to have
560 financial gain of DALTON/ETW.

The false statement and false matter are intrinsically false to the law which that false statement and that false matter relates to the committed crime of South Carolina Code 16-5-10 Conspiracy Against Civil Rights and the violation of civil rights of Section 46-55-20 "Industrial
565 Hemp Program; research; permits; regulations"; Part(2) against DALTON/ETW by the TRANSGRESSORS. The false matter is false affair, false state and false situation regarding said laws.

570 **4. SECTION 16-11-510 Malicious Injury to Animals and Other Personal Property**

*(A) It is unlawful for a person to willfully and maliciously cut, shoot, maim, wound, or otherwise injure or destroy any horse, mule, cattle, hog, sheep, goat, or any other kind, class, article, or description of personal property, or the goods and chattels of another.*

575 The TRANSGRESSORS willfully and maliciously injured the property of Dalton/ETW by refusing
to follow the law which allowed for DALTON/ETW to file a proper permit application to grow, to
extract CBD, terpenes and other cannabinoids, to manufacture products from these extracts,
and to market these said products in a wholesale and internet retail sales factions. The willful
and malicious injury decreased the value of ESTEC Technology Works, LLC, the property of
580 Robert C. Dalton. Also, the TRANSGRESSORS willfully and maliciously injured the value by
ruining the reputation of ESTEC Technology Works, LLC and the U.S. patents of Robert C.
Dalton. Furthermore, the TRANSGRESSORS willfully and maliciously injured and destroy the
DALTON/ETW application to grow hemp under the SCDA. The TRANSGESSORS willfully and
maliciously injured the reputation and consulting value of DALTON/ETW.

585

## 5. SECTION 16-17-410 Conspiracy

The common law crime known as "conspiracy" is defined as a combination between two or
more persons for the purpose of accomplishing an unlawful object or lawful object by unlawful
means.

590

The TRANSGRESSORS banded together for the purpose of accomplishing an unlawful object
which was maliciously and willful injured the property of DALTON/ETW. The TRANGRESSORS
banded together for the purpose of accomplishing an unlawful object which to was deny
DALTON/ETW the right to work with a qualified university pilot program for hemp research as
595 required under the SC Law.

The TRANSGRESSORS banded together to accomplish a lawful object by unlawful means by
eliminated the competition for private and public funding by DALTON/ETW's Planet Energy, a
research park, to the Research Parks and Research Programs of Clemson University.

The TRANSCRESSORS banded together to self-enrich themselves by a lawful object by unlawful
600 means by denying DALTON/ETW the capability to compete for a license to grow hemp and use
the profits from growing hemp and selling CBD product which allowed for the growth of Planet
Energy, thereby effectively eliminating the TRANSGRESSORS a local competitor for private and
public funds and investment thereby increasing the TRANGRESSORS ability to meet goals so the
TRANSGRESSORS can get bonuses and other financial and professional gains for themselves.

605 **DAMAGES SOUGHT**

The Plaintiff seeks damages. The Plaintiff seeks actual damages, non-economic damages and
prays for punitive damages (While the Plaintiff is a Christian, the Plaintiff believes that pray for
punitive damage instead of seek an amount of punitive damages is a violation by the State of
the Plaintiff's Civil Rights under the first Amendment of the U.S Constitution; the freedom of
610 speech, freedom of expression, and the freedom of religions of the Plaintiff is violated.

Furthermore, the State of South Carolina violates the commerce clause of the U.S. Constitution by controls the right of the 1st Amendment of the U.S. Constitution of individuals across state lines when having to file civil action in South Carolina.)

The Plaintiff seeks actual damages of $62 million dollars. See Appendix 1 in this document for
615    how the actual damages were calculated.

The Plaintiff seeks non-economic damages of $25 million dollars for pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, humiliation, fear of loss property value, fear of loss investment, fear of loss funding, and fear of loss of future employment of services.  The TRANSGRESSORS were negligent in their duties to the State and
620    to Clemson University, their employers. DALTON/ETW was injured and harmed by the willful, intentional and malicious actions and activity of the Transgressors.

Some of these damages are non-pecuniary; Some of these damages are pecuniary.

The amount of damage sought for total damages is the sum of $87 million dollar plus the Plaintiff prays for $10 Million in punitive damages.

625

I believe and declare under penalty of perjury that the foregoing is true and correct

Signed this 05 day of September, 2019

Signature of Plaintiff: _____
630                                     Robert Carl Dalton, pro se

Mailing Address:        Robert Carl Dalton
                        24 Maryland Rd.
                        Little Egg Harbor Twp., NJ 08087
635                        Phone: 609-879-9699
                        E-mail 1: rca.dalton@gmail.com

                        *****

640

645

650

655

APPENDIX 1

APPENDIX A: Yield and Value of Hemp Plants
and
CBD Products.

In the hemp industry, two measurement systems of weight are used; the English system and Metric system.

The English System of weight measure (pounds, lbs.) is used to measure the weight of harvested raw hemp plants as well as harvested hemp flower and leaves; the hemp plant material is valued in dollars per pound ($/lb) where this value is based upon the quality of the plant material and the CBD content of the plant material.

The Metric System is used to measure the weight of CBD, and the value of the CBD is express as dollars per kilogram ($/kg) or dollars per gram ($/gm). CBD have a significant value especially in the retail market.

As the Hemp CBD industry has developed, CBD and its natural form, CBDA, have gotten attention. CBDA is found in the hemp plant and is the acid form of CBD. CBD is produced by heating CBDA to decarboxylate CBDA. CBDA has been found to be more bioactive than CBD. So, the CBD Hemp market has transformed into an industry resolving the question of which CBD and CBDA products are desired by the marketplace. Another important chemical species in the hemp plant is terpenes. Terpenes are what expresses to these senses as the bouquet (or what one smells) of the hemp plant species. Proper methods of extraction will extract CBDA, CBD and terpenes. The quantity of each extracted species is dependent upon the extraction method.

Collectively, in the explanation of value, value is based upon Hemp CBD which is included what is know as "full spectrum CBD". Full spectrum CBD isolate is an isolate that contains CBDA, CBD, terpenes and other cannabinoids. As the hemp industry progresses and evolves, the quality measurements of the "Full Spectrum CBD" isolate will develop. In the meantime, the value of CBD will be based upon published values and retail prices.

Generally, the Hemp CBD industry has 3 or 4 tiers of the product. These tiers represent the harvest plant material to the retail product. The explanation is meant to provide a general overview of the industry and how value is created.

**TIER 1** Tier 1 of product is CBD in the form of CBDA with terpenes and other cannabinoids in the plant material itself. The weight percentage the collective extracted chemical species (the CBDA, CBA, terpenes and other cannabinoids) in the plant and the quality of the plant materials determines the value of the plant material. The value can range from $10/lb to $100/lb depending on market value and plant material quality.

**TIER 2** Tier 2 of product is the extracted CBD isolate. CBD is extracted from the plant materials by a variety of methods. Currently, the most popular methods have been

ethanol extraction and CO2 extraction. Other extraction methods include butane extraction, oil extraction, cold water extraction, and extraction by hydrocarbon mixtures. (In some products, the CBDA and terpenes are not extracted but utilized by chopping the plant flower and the leaves associated with the flower into a fine size.) The value of Tier 2 products be $10,000/kg or higher depending upon market conditions.

**TIER 3** Tier 3 of product is the refined Tier 2 products which is incorporated into a Tier 3 product. Tier 3 products includes tinctures, capsules, creams, etc. Tier 3 products can be sold wholesale or by internet sales at retail prices. Usually, Tier 3 products are sold by the milligram of CBD (or full spectrum CBD isolate) in the product. In 2016 and 2017, the prices for a 1000 mg CBD product at a retail store at the kg-price-equivalent ranged from of $90,000/kg to $135,000/kg; The prices for the wholesale-price-equivalent is about 50% of the retail (keystone price), and sometime the wholesale price could be higher than 50%; the wholesale prices of Tier 3 products ranged from of $45,000/kg to $62,500/kg.

**TIER 4** Tier 4 of product is the retail sales of the Tier 3 products at brick & mortar stores or over-the-counter sales. In 2016 and 2017, the retail-price-equivalent for a 1000 mg CBD product at a retail store ranged from $90/1000 mg to $135/1000 mg or, at the kg-price-equivalent, the retail prices ranged from of $90,000/kg to $135,000/kg.

The acreage value of products of Planet Energy at these Tier level can be calculated; the Planet Energy value would have been in the millions of dollars even tens of millions of dollars.

Unless one believes that the God has made individuals in South Carolina to be stupid, otherwise only corruption, avarice and poor management can explain the poor success of the hemp industry in South Carolina during its first two years of existence. I do not believe that God individuals in South Carolina as brilliant as any of his children anywhere.

The calculated value of Planet Energy total actual damages is $64 Million. The value of the non-economic damages is $25 Million. And Punitive Damages are prayed for.

The total damages are $89 million and Punitive Damages are prayed for. The plaintiffs pray for punitive damages.

See Appendix A1 for the Calculated Value of Hemp to ESTEC Technology Works, LLC (d.b.a. Planet Energy and 100% owned by Robert C. Dalton)

APPENDIX A1: ACTUAL DAMAGES

Potential Yields and Values of Hemp plants for CBD, CBD Isolate, CBD products

|  | 4 foot center to center plants | | | | Yield of Plant Mass for CBD and Yield of CBD Isolate. | | | | | | | | |
|  |  | | | CBD Hemp Product Yields | | | | | CBD Hemp Product Value | | | | |
|  | plants per acre | yield per plant (gm) | CBD Plant Material yield (lb)/acre | CBD Plant Material yield (lb)/18acres | Pure CBD (kg)/acre | Pure CBD (kg)/18acres | Plant Value/acre | Plant Value/ 18acres | CBD Isolate/acre | CBD Isolate/18 acres | # of 1000mg product | | 37% profit margin |
| # of plants |  | 2722 | 340 | 2039 |  |  |  |  |  |  |  |  |  |
| adj. # of plants |  | 2500 | 313 | 1877 | 33786 | 75.68 | 1362.19 | 46925 $ | 844,650.00 $ | 756,772.27 $ | 13,621,000.91 $ | at 89/1000 mg | 122,597,516.18 $ | 45,457,040.70 |
| % poss. Plants |  | 0.00 |  |  |  |  |  | 93850 $ | 1,689,300.00 |  |  | at 139/1000mg | 189,344,423.64 $ | 63,483,896.47 |
|  | 0.920588235 |  |  |  | 312.9867582 |  |  |  |  |  |  | $ |  |  |
|  |  | 0.920549289 |  |  |  |  |  |  |  |  |  |  |  |  |
|  | 1877.079412 |  |  |  |  |  |  |  |  |  |  |  |  |  |